UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL ADAMS,

                                Plaintiff,

                      v.

ANTHONY J. ANNUCCI, Commissioner, et al.,

                              Defendants.
_____

<u>DECISION AND ORDER</u>

18-CV-6277L

       Plaintiff Michael Adams, appearing *pro se*, brings this action under 42 U.S.C. § 1983. Plaintiff, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), alleges that defendants, all of whom were at all relevant time DOCCS employees, violated his constitutional rights in several respects in connection with certain incidents that occurred while he was confined at Five Points Correctional Facility.

       On April 12, 2019, the Court issued an Order (Dkt. #30) pursuant to 28 U.S.C. §§ 1915(e)(2)(B), dismissing several of plaintiff's claims. The remaining claims relate to two incidents that occurred on March 10, 2017.

       Several motions are pending before the Court. In two separate motions, the five remaining defendants have moved for summary judgment. (Dkt. #52, #92.) Plaintiff has also moved for summary judgment (Dkt. #56, #82), and for injunctive relief (Dkt. #86).

       Plaintiff's original deadline to respond to defendants' more recent summary judgment motion was December 9, 2020. On March 2, 2021, the Court granted plaintiff's request for an extension, and gave him until April 2 to file his response. He has not done so.

For the reasons that follow, defendants' motions are granted, plaintiff's motions are

denied, and the complaint is dismissed.


**DISCUSSION**

**I. Failure to Exhaust**

Plaintiff's claims arise out of two incidents that occurred on March 10, 2017, and one

incident on March 20, 2017. Defendants have submitted proof that plaintiff did not grieve any of

those incidents, and plaintiff has not rebutted that proof. Plaintiff's claims must therefore be

dismissed for failure to exhaust his administrative remedies.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any

administrative remedies available to him before bringing an action for claims arising out of his

incarceration. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002); *see also Woodford v. Ngo*, 548

U.S. 81, 82 (2006). The exhaustion requirement applies "to all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong." *Porter*, 534 U.S. at 532. Further, the exhaustion

requirement applies even where the prisoner seeks relief not available in the administrative

grievance process, such as monetary damages. *Id.* at 524. To exhaust administrative remedies,

the inmate must complete the full administrative review process set forth in the rules applicable

to the correctional facility in which he is incarcerated. See Jones v. Bock, 549 U.S. 199, 218

(2007).

Defendants have submitted a declaration of Mandi Schultz, the Inmate Grievance

Program Supervisor at Five Points. She states that she has searched the electronic records and

hard copies for any grievances filed by plaintiff regarding the events giving rise to this lawsuit, and found none.  (Dkt. #92-7.)  Plaintiff has not rebutted that evidence.

Plaintiff testified at his deposition that he was familiar with the DOCCS grievance process and the appeal process.  Tr. (Dkt. #92-9) at 388.  He stated that he "wrote grievances about everything," Tr. at 393, but he has submitted no copies of any grievances concerning the incidents at issue in this lawsuit.  Plaintiff testified that he never received a grievance number or other acknowledgment that his alleged grievances had been received, and although plaintiff stated that he appealed, he again has not substantiated that claim.  At his deposition, plaintiff offered nothing but broad assertions that he "wrote to everybody," Tr. at 390, and "wrote to a lot of people," Tr. at 391, including "straight to Albany."  Tr. at 395.  Despite his contention that he "kept his own copies," Tr. at 390, plaintiff was equivocal, if not evasive, when asked whether he had or could produce copies of his grievances and appeals.  He has not done so.

Nor has plaintiff presented any evidence that he was somehow prevented from utilizing the grievance process, or that his efforts to do so were thwarted by defendants.  In short, he has simply alleged, without factual support, that he sent grievances and letters about "everything" to "everybody" and got no responses.  Absent some corroboration or specifics, those broad, conclusory allegations are insufficient even to give rise to an issue of fact about whether plaintiff satisfied the exhaustion requirement.  *See Toro v. City of New York*, No. 12-CV-4093, 2015 WL 1014044, at *5 (E.D.N.Y. Mar. 6, 2015) (granting summary judgment where "there is no evidence–beyond the allegations in his complaint and his own unsupported deposition testimony–that the [plaintiff] actually reported such misconduct to the authorities"); *Litchmore v. Williams*, No. 11-CV-7546, 2013 WL 3975956, at *6 (S.D.N.Y. Aug. 5, 2013) (granting

summary judgment where there was "no evidence" that the "plaintiff's appeal was actually mailed, intercepted, or ignored" and no "evidence of any particular officer's misconduct").

## II. Merits of Plaintiff's Claims

### A. Defendant Bradly

The Court's conclusions on the exhaustion issue render it unnecessary to address the merits of plaintiff's claims, but it is so patently clear that they are meritless that the Court will address them.

As to defendant "Bradly," there is no evidence that any correction officer by that name was employed at Five Points at the time of the underlying events.  Defendants have submitted proof that there is a DOCCS officer named Bradley, but she was employed at a different facility at the time.  In addition, Bradley is a woman, whereas plaintiff states that "Bradly" is a man.  *See* Bradley Decl. (Dkt. #52-3); Plaintiff's Decl. (Dkt. #56) at 4.  There is thus no basis for any claim against "Bradly."

### B. Defendant Brady

Plaintiff has also asserted a claim against Correction Officer ("C.O.") Shannon Brady.[1] The incident involving Brady occurred on March 10, 2017, while Brady was collecting inmates' food trays from their cells.

Plaintiff alleges that when Brady got to his cell, he told her that he needed medical attention because he had burned his penis in the shower.  He claims that she asked him to show it

---

[1] Despite the similarity in their names, it does not appear that plaintiff has confused Brady and Bradly.  He has stated unequivocally that they are two different people, female and male respectively.  Pl. Decl. at 4.

to her.  He then put his penis in the open food tray slot, whereupon Brady slammed the slot door closed.  Plaintiff began screaming, Brady summoned assistance, and several other C.O.s arrived. The slot was opened, and the other C.O.s took plaintiff to the infirmary, where he received medical treatment.  According to plaintiff's medical records, he suffered a one-inch laceration on his penis, which was cleaned and sealed with a steri-strip.  Def. Ex. 3.[2]

Brady has submitted a declaration (Dkt. #92-3) in which she states that she was simply performing the routine duty of collecting food trays, that she never asked plaintiff to show her his penis, and that she had no idea that he had placed his penis in the slot when she closed the slot hatch.

Defendants have submitted a video recording of the incident, taken from a camera in the hallway where plaintiff's cell was located.  The video (which has an audio track) shows Brady arrive at plaintiff's cell and begin picking up the trays from the "feed-up shoot," or slot, which is an open-ended metal box protruding from the outside of the cell door.[3]  Defendants state that the feed-up shoot was affixed to plaintiff's door because he had previously thrown things at staff members through the slot and had tried to prevent staff from closing the hatch on one occasion when he was demanding to speak to a sergeant.[4]

There is no indication that Brady and plaintiff carried on any sort of conversation, much less one about his penis.  She appears to simply go about her business of collecting the trays.

---

[2] A hard copy of plaintiff's entire medical record has been filed under seal.

[3] Although "chute" would seem to be a more apt term than "shoot," defendants' papers consistently refer to this device as a "feed up shoot."

[4] At his deposition, plaintiff agreed that his cell door had a feed-up shoot "from me throwing food out of the slot," and that he had once "held up the slot" when he wanted to speak to a sergeant, apparently to complain that he had not been given coffee cake with his meal.  Tr. at 65, 66.

Other than to remove the trays, she gives no indication of looking at or through the slot or the small cell window.

Brady can then be seen engaging the mechanism to close the slot.  Plaintiff immediately begins screaming and yelling "My dick! Open it!"  About 15 seconds later, Brady appears to re-engage the mechanism, presumably to open the slot.  Two other C.O.s arrive in less than a minute and begin talking to plaintiff through the cell door, at which point the recording ends.

Plaintiff has asserted an Eighth Amendment claim against Brady, alleging that she knew that his penis was in the slot (at her request) and that she deliberately slammed the slot door shut on it.  To make out such a claim, plaintiff would have to show not only that he suffered an objectively serious injury, but that Brady acted "maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).  In assessing the claim, the Court must consider both the subjective and the objective components.  *Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir. 1994).

Plaintiff's claim against Brady is flatly and conclusively refuted by the audiovisual recording.  As stated, there is no indication that Brady said anything to plaintiff, that she was looking at the slot, or that she had any reason to think, when she closed the slot door, that his penis was in the slot.

Defendants have also submitted photographs of the feed-up shoot.  Brady Decl. Ex. A. Although it has a transparent top, presumably to allow the officer to see the food tray, it would obviously be very difficult, without bending down to peer inside (which Brady did not do), to see the inside of plaintiff's cell, which by his own admission was unlit at the time of the incident.  Tr. at 73.  Plaintiff also stated that "she had to look into the box ... the actual slot."  Tr. at 65.  It is

also evident from the photos that the cell door was several inches thick, which would have made it even more difficult to see through the slot.[5]

Nor did Brady delay in opening the slot door.  Although plaintiff initially testified that it took Brady about two minutes to do so, Tr. at 76, he later reduced that estimate to "a couple of seconds," Tr. at 77, 78.  As stated, it appears from the video that about 15 seconds elapsed from plaintiff's first cries of pain to the point when Brady opened the slot, but she did not appear deliberately to wait or prolong plaintiff's agony, and given the unusual and unexpected nature of this occurrence, it would have been surprising if it had *not* taken a few seconds for her to realize what was going on.  In short, there is simply no evidence upon which a reasonable trier of fact could find that Brady acted with the requisite state of mind to give rise to an Eighth Amendment claim.

### C. Defendant Nuffer

Next, plaintiff brings a claim of excessive force against C.O. Jarrett Nuffer.  Nuffer was present at the second March 10 incident.  On this occasion, plaintiff got into an altercation with his cellmate, inside the cell.  Defendants contend that the two inmates were fighting and ignored commands to stop.  Plaintiff claims they did no more than "tussle" with each other.

At any rate, several C.O.s, including Nuffer, responded to a call of inmates fighting. Plaintiff and his cellmate were removed from the cell.  Plaintiff alleges that he came out voluntarily, but the officers grabbed him and threw him against the wall.  At his deposition,

---

[5] Plaintiff stated that because of the location and size of the window, and because his cell was dark, it would have been impossible for Brady to have seen his penis through the cell door window.  Tr. at 74.

plaintiff stated, "When I hit the wall, my eye – my head hit the wall, my eye bust open and I had blood coming from my eye and then they cuffed me."  Tr. at 158.

Defendants have submitted a video recording of this incident as well, also taken from a camera in the hallway.  At the beginning of the video, plaintiff is seen being escorted to his cell by three C.O.s.  He enters the cell, the door is closed, and the C.O.s are heard shouting at plaintiff and his cellmate to "break it up" and "stop fighting."  Several other C.O.s arrive a short time later.  Several of them don helmets and face shields, enter the cell, and come out with plaintiff.  They place him against the opposite wall, facing the wall, and he is handcuffed and led away.  Plaintiff's cellmate is then removed from the cell and taken away.

Nuffer has submitted a declaration (Dkt. #92-6) identifying himself in the video as one of the officers who responded to the call for assistance.  He states that he is the officer seen wearing a baseball cap.  Plaintiff has not presented any evidence to the contrary.[6]

It is clear from the video that all Nuffer did was hand out protective gear to the other C.O.s.  He was not one of the officers who removed plaintiff from his cell or put him against the wall.  Once plaintiff was facing the wall, Nuffer provided handcuffs, which he assisted in applying.

There is thus no basis for a claim against Nuffer in connection with these events.  Regardless of whether plaintiff was injured by being slammed against the wall, as he claims, Nuffer was not among the officers who did so.  *See Grinols v. Beers*, __ F.Supp.3d __, 2021 WL

---

[6] As noted, plaintiff has not responded to defendants' motion for summary judgment.  In general, when a party fails to respond to an opposing party's motion for summary judgment, the Court may accept the truth of the movant's factual allegations.  *Johnson v. Annucci*, 314 F.Supp.3d 472, 474-75 (W.D.N.Y. 2018); *Crenshaw v. Syed*, 686 F.Supp.2d 234, 235-36 (W.D.N.Y. 2010).  Because plaintiff has also moved for summary judgment, however, the Court will consider his factual allegations and evidence in assessing defendants' motion.

1246024, at *8 (W.D.N.Y. Apr. 5, 2021) ("For a defendant to be held individually liable in an action under § 1983, the plaintiff must show that the defendant was personally involved in the alleged deprivation").

Moreover, the video contradicts plaintiff's allegation that he *was* thrown against the wall. The other C.O.s simply walked him over to the wall opposite his cell and held him there until he was handcuffed. Although plaintiff's medical records show that he did suffer a laceration above one eye, the forms completed by medical staff state that this was "consistent with [a] cell fight," Def. Exs. 4, 5, and from the video it seems virtually impossible for the laceration to have been caused by the manner in which he was put up against the wall. In any event, Nuffer had nothing to do with it.

The video also disproves plaintiff's allegation that after he came out of his cell, defendants made him assume a crouching position, put a stick between his arms, and pushed his arms "all the way up to [his] neck," *see* Tr. at 158. Plaintiff was standing the entire time, and when led away he was walking upright.

Plaintiff also alleges that after he arrived at the infirmary, Nuffer and two other officers beat him with their fists "for a good two minutes." Tr. at 183. He testified that he was beaten so badly that he "kind of blacked out ... ." Tr. at 180. He claims that he suffered injuries to his jaw, wrist, the back of his head, and his back, Tr. at 190, including "lumps in [his] head" and a fractured right wrist, Tr. at 194.

The medical evidence does not corroborate–in fact, it refutes–these allegations. The only injuries noted on March 10 were the laceration on his penis, and the laceration above his left eye. The photographs of plaintiff taken at the infirmary likewise give no evidence of any other

injuries.  Def. Ex. 6.  If, as plaintiff alleges, the laceration near his eye was caused by his being thrown against a wall, by his own admission that happened before he was taken to the infirmary. In addition, plaintiff's right hand was x-rayed on March 21, 2017 (in connection with another incident, which is discussed below), and no fractures were found.  Med. Rec. at 82.

In sum, the evidence simply does not support plaintiff's allegation that he was beaten up by Nuffer and two other C.O.s at the infirmary.  His medical records indicate only two injuries on that date, one of which occurred in the "feed-up shoot" incident, and the other of which was inflicted prior to his arrival at the infirmary, most likely during plaintiff's fight with his cellmate. Although plaintiff testified that he told medical staff "multiple times" that he thought his wrist had been fractured, Tr. at 214, there is no record of his having done so.  Even construing the record in the light most favorable to plaintiff, then, I conclude that the evidence is so one-sided that defendants are entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### D. Defendant Tellier

Plaintiff alleges that on March 20, 2017, his cell was subjected to (an apparently routine) search.  During the search, he was made to stand nearby in handcuffs, while a C.O., whom he identifies as Officer Tellier, held the handcuffs behind his back.

After the search was completed, plaintiff was led back into his cell.  He alleges that while his hands were still outside the cell, the cell door was closed, injuring his hands.  He alleges that

he suffered, pain, swelling and bruising as a result.  X-rays were negative, and he was given ibuprofen for his pain.[7]

Plaintiff's Eighth Amendment claim against Tellier fails for several reasons.  First, Tellier was not personally involved.  Plaintiff described Tellier as "an older woman" with "[b]lackish, blondish hair" who was about five feet seven inches tall.  Tr. at 43.  Tellier has submitted a declaration (Dkt. #92-8) stating that he is male, does not have black or blond hair, and stands about five feet eleven inches.  He denies using any force against plaintiff at any time on March 20, 2017.  There is no evidence rebutting those assertions.

Aside from that, the events described by plaintiff do not give rise to an Eighth Amendment claim.  According to his testimony, the officer who had been holding his handcuffs had let go of them before the cell door was closed.  He has presented no evidence that the officer knew that the door would close on his hands, or for that matter who was responsible for the door being closed, which was apparently done remotely by a different officer.  Plaintiff simply speculated that "Tellier" must have given a signal to close the door and let go of the handcuffs just before the door closed.  Such speculation is not evidence.  Plaintiff has also not demonstrated that the officer in question acted out of malice, with an intent to cause him to suffer pain or injury for no legitimate purpose, as required for an Eighth Amendment claim.

---

[7] Although plaintiff testified that he disagreed with the x-ray results, Tr. at 339, his subjective disagreement with those results does not give rise to a claim or to an issue of fact.  *See Jenkins v. Walls*, No. 20-CV-1224, 2020 WL 1140782, at *4 (S.D.N.Y. Mar. 6, 2020) (inmate's disagreement with his doctors' diagnosis did not rise to level of constitutional violation).

### E. Defendant Cleveland

Plaintiff has also brought an Eighth Amendment claim against "Nurse Cleveland," who he describes a woman, about "five foot, or four nine." Tr. at 39. He alleges that Cleveland treated the injury to his penis. Plaintiff testified that he asked her to give him something for his pain, but she and another nurse (who was treating the laceration near plaintiff's eye) said that they would not give him any "because [he] d[id]n't know how to respect women." Tr. at 199.

This claim fails, first, because once again no one by that name was present. Defendants have submitted evidence that there is an *officer* named Cleveland, but he is male and was employed at Elmira Correctional Facility at the time of these events.

And also once again, the claim fails on the merits. Plaintiff was treated for his injuries, and the treatments appear to have been reasonable and adequate. This claim is therefore dismissed as well.

### III. Plaintiff's Motions

Plaintiff has moved for summary judgment in his favor. As the above discussion makes clear, his claims are meritless, for a number of reasons, and must be dismissed. Plaintiff's motions consist of little more than argument, conclusory allegations, and unwarranted assumptions. His motions for summary judgment are therefore denied.

Plaintiff has also filed a motion for injunctive relief, complaining that defendants continue to violate his rights and seeking an order enjoining them from continuing to do so. That motion is denied. Plaintiff has not met the standards for the issuance of injunctive relief in this

circuit. *See Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 172 (2d Cir. 2001); *Tindal v. Goord*, 530 F.Supp.2d 465, 468 (W.D.N.Y. 2008), *aff'd*, 340 F.App'x 12 (2d Cir. 2009).

## CONCLUSION

Defendants' motions for summary judgment (Dkt. #52, #92) are granted, and the complaint is dismissed.

Plaintiff's motions for summary judgment (Dkt. #56, #82) and his motion for injunctive relief (Dkt. #86) are denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
May 6, 2021.

-13-